AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Virginia

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

Information Related to 14 Google Accounts Listed in Attachment A Associated with Troy George Skinner That is Located in Premises Controlled by Google, Inc.

)
)
)
)
)
)

Case No.5

3:19sw219 -
3:19 SW 232 (see attachment A)

AUG – 1 2019

CLERK, U.S. DISTRICT COURT
RICHMOND, VA

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, fully incorporated by reference herein;

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, fully incorporated by reference herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251(a); 2252(A) | Production of Child Pornography; Distribution or Receipt of Child Pornography |
| 18 U.S.C. § 2422(b) | Coercion and Enticement |
| 18 U.S.C. § 1201(a) & (d) | Kidnapping and Attempted Kidnapping |

The application is based on these facts:

See attached Affidavit, fully incorporated by reference herein.

☐ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Anthony Tuggle, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 08/01/2019 _____

/S/
David J. Novak
United States Magistrate Judge
_____
*Judge's signature*

City and state: Richmond, Virginia

David J. Novak, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information related to multiple accounts, hereafter "the TARGET

ACCOUNTS," associated with TROY GEORGE SKINNER, specifically:

|     | Email Account | Case Number |
| --- | --- | --- |
| 1.  | lottic.ysw@gmail.com | 3.19SW219 |
| 2.  | johnvlogchamber@gmail.com | 3'.19SW220 |
| 3.  | pauldewittdobsin@gmail.com | 3:19SW221 |
| 4.  | t129173964@gmail.com | 3:19SW222 |
| 5.  | kundtjohn@gmail.com | 3:19SW223 |
| 6.  | whentheybenefit@gmail.com | 3:19SW224 |
| 7.  | bennythecon1@hotmail.com | 3:19SW225 |
| 8.  | echochamberjp@gmail.com | 3:19SW226 |
| 9.  | weegee09@gmail.com | 3:19SW227 |
| 10. | asscummer@gmail.com | 3:19SW228 |
| 11. | futurebanditnz@gmail.com | 3:19SW229 |
| 12. | ymr.chinastr@gmail.com | 3:19SW230 |
| 13. | farewell2814@gmail.com | 3:19SW231 |
| 14. | johnathon1800@gmail.com | 3:19SW232 |

for the period from **June 20, 2018, to June 22, 2018**, including the associated location data,

which is stored at premises owned, maintained, controlled, or operated by Google, Inc. 1600

Amphitheater Parkway, Mountain View, California 94043.

## **ATTACHMENT B**

### I.    **Information to be Disclosed by Google**

To the extent that the information described in Attachment A is within the possession,

custody, or control of Google Inc. ("Google"), including location information or records, files,

logs, or information that have been deleted but are still available to Google containing location

information, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f),

Google is required to disclose the following information to the government for each of the

TARGET ACCOUNTS listed in Attachment A, from **June 20, 2018, to June 22, 2018**,

including but not limited to:

(a)    All contact and personal identifying information, including: full name, user
identification number, birth date, gender, contact e-mail addresses, Google
passwords, Google security questions and answers, physical address (including
city, state, zip code, country), telephone numbers, screen names, websites, and
other personal identifiers;

(b)    All mobile phone devices associated with TARGET ACCOUNTS, and associated
identification for those devices, including IMEI, IMSI, and make and model of
the phone device(s):

(c)    All Location history data including GPS, Cellular, Wi-Fi, or other in the custody
or control of Google.

(d)    All "check ins" and other location history information;

(e)    All IP logs, including all records of the IP addresses that logged into the account[3];

(f)    The length of service (including start date) and the means and source of any
payments associated with the service (including any credit card or bank account
number).

---

[3]      "Logged-in" means to access the account using authentication credentials (*e.g.,*
passwords, PINS, *etc.*), not merely view the account from a different Facebook User ID account
or publicly via the Internet.

## II. Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and

instrumentalities of violations 1) kidnapping and attempted kidnapping, in violation of 18 U.S.C.

§§ 1201(a) and 1201(d); 2) production of child pornography, in violation of 18 U.S.C. § 2251;

and 3) distribution, receipt and possession of child pornography, in violation of 18 U.S.C.

§ 2252A; involving **TROY GEORGE SKINNER,** from **June 20, 2018, to June 22, 2018,**

including, for the TARGET ACCOUNTS identified on Attachment A, information pertaining to

the following matters:

(a) Evidence indicating how and when the TARGET ACCOUNTS were accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime(s) under investigation and to the TARGET ACCOUNT owner(s);

(b) Evidence indicating the TARGET ACCOUNT owner's/owners' state of mind as it relates to the crime under investigation;

(c) The identity of the person(s) who created, used, or communicated using the TARGET ACCOUNTS, whether that is TROY GEORGE SKINNER or some other person, including records that help reveal their whereabouts.

2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION RELATED TO 14 GOOGLE ACCOUNTS LISTED IN ATTACHMENT A ASSOCIATED WITH TROY GEORGE SKINNER THAT IS STORED IN PREMISES CONTROLLED BY GOOGLE, INC. | 3:19-sw-_219_ through 3:19sw232 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Anthony W. Tuggle, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with the certain Google accounts associated with TROY GEORGE SKINNER (hereafter "the TARGET ACCOUNTS"), identified more fully below, which is stored at premises owned, maintained, controlled, or operated by Google, Inc. ("Google"), an internet based social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the TARGET ACCOUNTS.

2.      I am a Special Agent of the Federal Bureau of Investigation (FBI), United States Department of Justice, and have been so employed by the FBI for over nineteen years. I am currently assigned to the Richmond Field Office, Richmond, VA. I am assigned to the squad

which conducts investigations pertaining to child sex trafficking, child pornography, child abductions and public corruption. I have investigated criminal matters concerning violations of federal laws commonly referred to as "white collar crimes", such as financial institution, investment fraud, securities fraud, mortgage fraud, and fraud by wire and mail. I have received training from the FBI in the various areas of "white collar crime", public corruption, and general investigations. I have also been assigned to and investigated national security matters.

3.     I am familiar with the facts and circumstances of the investigation through discussions with other agents of the FBI and other law enforcement agencies; from my discussions with witnesses involved in the investigation; and from my review of records and reports relating to the investigation. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another FBI agent, law enforcement officer, or witness who may have had either direct or hearsay knowledge of that statement, and to whom I or others have spoken or whose reports I have read and reviewed. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     I believe that this affidavit establishes probable cause to believe that information associated with the TARGET ACCOUNTS constitute evidence, fruits and instrumentalities of the following offenses: 1) kidnapping and attempted kidnapping, in violation of 18 U.S.C. §§ 1201(a) and 1201(d); 2) production of child pornography, in violation of 18 U.S.C. § 2251; and 3) distribution, receipt and possession of child pornography, in violation of 18 U.S.C. § 2252A. This affidavit is intended to show only that there is sufficient probable cause for the

2

requested warrant and does not set forth all of my knowledge about this matter. The information provided is based upon my personal knowledge, or that of other sworn law enforcement officers participating in this investigation.

5.     Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth facts that I believe are necessary to search the business records maintained by Google.

## IDENTIFICATION OF THE GOOGLE ACCOUNTS FROM WHICH INFORMATION IS TO BE OBTAINED

6.     The requested search warrant is intended to obtain geographic position and other information associated with the following Google accounts, i.e., "the TARGET ACCOUNTS," associated with TROY GEORGE SKINNER:

> **lottic.ysw@gmail.com**
> **johnvlogchamber@gmail.com**
> **pauldewittdobsin@gmail.com**
> **t129173964@gmail.com**
> **kundtjohn@gmail.com**
> **whentheybenefit@gmail.com**
> **bennythecon1@hotmail.com**
> **echochamberjp@gmail.com**
> **weegee09@gmail.com**
> **asscummer@gmail.com**
> **futurebanditnz@gmail.com**
> **ymr.chinastr@gmail.com**
> **farewell2814@gmail.com**
> **johnathon1800@gmail.com**

which is stored at premises owned, maintained, controlled, or operated by Google, Inc.

3

("Google"), an Internet-based social networking company headquartered in Menlo Park, California.

7.     The applied-for warrant would authorize the receipt and review of information from the TARGET ACCOUNTS for the purpose of identifying records more particularly described in Attachment B.

## BACKGROUND RELATING TO GOOGLE AND RELEVANT TECHNOLOGY

8.     A cellular telephone or mobile telephone is a handheld wireless device used primarily for voice communication through radio signals. Cellular telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other cellular telephones or traditional "landline" telephones. Cellular telephones rely on cellular towers, the location of which may provide information on the location of the subject telephone. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

9.     Google is an Internet company which, among other things, provides electronic communication services to subscribers. Google allows subscribers to obtain email accounts at the domain name gmail.com. Subscribers obtain an account by registering with Google. During the registration process, Google asks subscribers to provide basic personal information. Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

4

10.     In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). Such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know that even if subscribers insert false information to conceal their identity, I know that this information often provide clues to their identity, location or illicit activities.

11.     I also know from my training and experience that email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

12.     As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or

5

alternatively, to exclude the innocent from further suspicion.  In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account.  Further, information maintained by the email provider can show how, where, and when the account was accessed or used.  Based on my training and experience, I have learned that Google also maintains records that may reveal other Google accounts accessed from the same electronic device, such as the same computer or mobile device, including accounts that are linked by Hypertext Transfer Protocol (HTTP) cookies, which are small pieces of data sent from a website and stored in a user's Internet browser.

13.     Google has developed an operating system for mobile devices, including cellular phones, known as Android.  Nearly every cellular phone using the Android operating system has an associated Google account and users are prompted to add a Google account when they first turn on a new Android device.

14.     Based on my training and experience, I have learned that Google collects and retains location data from Android-enabled and Apple mobile devices when a Google account user has enabled Google location services.  The company uses this information for location-based advertising and location-based search results.  This information is derived from GPS data, cell site/cell tower information, and Wi-Fi access points.

15.     Location data can assist investigators in understanding the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email).

6

16.     Therefore, the servers of Google are likely to contain all the material described
above, including stored electronic communications and information concerning subscribers and
their use of Google, such as account access information, transaction information, and other
account information.

## PROBABLE CAUSE

17.     In December 2017, the defendant, TROY GEORGE SKINNER, met a 13-year-
old girl who lives in Goochland, Virginia (hereafter identified as "V1"), on the Internet in an
online game launcher called Steam. SKINNER and V1 began chatting in Steam before
transitioning to a different online platform called Discord, where they continued to chat. Discord
is a cross-platform communication application designed for the online gaming community that
can be downloaded and accessed through both cellular telephones and desktop computers.
SKINNER and V1's online relationship was a simple friendship for several weeks, but in early
January 2018 the relationship began to turn romantic. It wasn't long after the conversations
became romantic that both SKINNER and V1 exchanged nude photographs of each other and
engaged in live video chat sessions that involved nudity and masturbation by both.

18.     From the beginning of their online relationship, SKINNER knew he was
communicating with a child. On December 27, 2017, during one of their first chat sessions on
Discord, SKINNER asked V1 how old she was. V1 replied "16," which in reality was an
exaggeration because she was only 13 years old at the time. The defendant informed her,
truthfully, that he was 24 years old. Shortly after that exchange SKINNER said, "I thought you
were at least 18," to which V1 replied, "Nope."

19.     V1's status as a juvenile came up one way or another repeatedly in conversations
between the girl and SKINNER. During a December 17, 2017 chat session, evidently in

7

response to something that V1 had said in an earlier voice conversation, SKINNER joked, "cause u have been homeschooled and live in the fuckin woods." On January 7, 2017, SKINNER and V1 again talked about how V1 was homeschooled, including V1's comment, "Homeschooled kids are socially awkward kids." Later on January 7, 2017, SKINNER told V1 that he wanted to be her boyfriend. The conversation continued:

| V1: | "Even though I'm 8 years younger?" |
|---|---|
| SKINNER: | "yup" |
| V1: | "You wouldn't mind being called a pedo?" |
| SKINNER: | "are you calling me a pedo" |
| V1: | "No" |
| V1: | "Definitely not" |

20.     On January 9, 2017, SKINNER and V1 had an online chat session that discussed a mutual online contact named "Jenni," who evidently was romantically interested in SKINNER. The conversation essentially involved SKINNER and V1 expressing their frustration that "Jenni" was upset that V1 had broken up with her then online boyfriend to be with SKINNER, which upset "Jenni," as evidence by V1's comment, "Jenni just old you off." The conversation continued:

| V1: | "I said this would happen when we were together" |
|---|---|
| V1: | "You'd be called a pedo" |
| SKINNER: | "yup you were right" |

21.     The above chats reflect just a fraction of the total information conveyed to SKINNER informing him that V1 was an underage minor. SKINNER and V1 had multiple live stream video sessions, during which they both could view each other with reasonably high definition webcams. V1's short stature and youthful appearance undoubtedly were plain for SKINNER to see. The topics of V1's life at home living with her parents and being homeschooled were also discussed during video sessions.

22. As time went on, the relationship between SKINNER and V1 became more sexual. V1 believed that the first time something sexual happened was during a Discord video chat. At first, V1 would strip for SKINNER during video chat sessions. SKINNER had asked V1 whether she was comfortable stripping, i.e., removing all of her clothing, for him. V1 said she was, and so she started stripping nude for SKINNER. Eventually both V1 and SKINNER stripped for each other during video chat sessions. When this happened, SKINNER would often masturbate during the video sessions. SKINNER sometimes asked V1 to touch her breasts or masturbate herself while he watched, which was a request that V1 regularly accommodated. During their online relationship SKINNER also sent V1 photographs of his penis, and she sent him photographs of her breasts and genitals.

23. These video chat sessions were not recorded by the Discord platform, but the government's investigation has revealed that SKINNER often recorded portions of these video sessions without V1's knowledge. When SKINNER was arrested on June 22, 2018, law enforcement officers seized two cell phones from him, i.e., a Huawei ALE-L02 P8 Lite and a Samsung GT-I9300 Galaxy S III. Forensic examination of those phones revealed that they had been used to access two Gmail accounts, i.e., johnvlogchamber@gmail.com and lottic.ysw@gmail.com. Searches of those devices and accounts revealed the following child pornography images, which are charged in Counts One through Four of the Indictment.

24. Count One charges SKINNER with the production of an image file entitled, 20180203_074421.jpg, on or about February 3-4, 2018[1]. The file name nomenclature for this

---

[1] Because of the significant time difference between SKINNER's home in New Zealand and the Eastern Time Zone, depending on the exact hour of day when the image was produced the respective dates of production in New Zealand and Virginia could be different. To account for this possibility, all counts in the Indictment allege a two-day date range.

9

image is consistent with the naming convention used by Samsung mobile phones, which both SKINNER and V1 owned. The image file, which was obtained pursuant to a federal search warrant related to SKINNER's johnvlogchamber@gmail.com account, is a close-up photograph depicting the lascivious exhibition of V1's genitals. Based on the presence of a particular snow globe in the corner of the photograph, the photograph was taken inside of V1's bedroom.

25.     On the same day that this photograph was produced, SKINNER and V1 chatted via Discord during which he joked about her being a lost child when she got separated from her parents while they were together in a furniture store. In particular, Skinner acknowledged her underage status by making retorts to V1's jokes about PA announcements, such as:

| V1: | "Lost teenage child, parents please come to the front" |
| SKINNER: | "Lost 16 year old" |
| | * * * |
| V1: | "16 year old midget girl lost her parents" |
| V1: | "Please come to the front" |
| SKINNER: | "Absolute 10 year old lost" |
| SKINNER: | "Claims shes 16" |

26.     Count Two pertains to the production of a movie file entitled "Desktop 02.06.2018-03.16.130100.DVR.mp4 on or about February 5-6, 2018. Investigators found this movie file on SKINNER's Huawei cell phone that was seized at the time of his arrest in Goochland. Forensic analysis revealed that the movie was downloaded to the phone from SKINNER's johnvlogchamber@gmail.com account. The movie, which lasts 6:00 minutes, depicts V1 bent over and kneeling on her bed in her bedroom while engaging in both masturbation and the lascivious exhibition of her genitals. The vantage point of the camera is a desk across from the bed. Later in the video V1 is plainly seen getting up and walking over to the area of the camera to do something with a nearby computer. The video has an avatar in the

10

upper right hand corner indicating that it was made during an online chat session, with the avatar reflecting the identity or "persona" of the other individual engaging in the online video chat session with V1 when the movie file was produced.

27.     Count Three relates to an image file named "20180223_120558.jpg," created on or about February 22-23, 2018, that is connected to both SKINNER's Samsung phone as well as his lottic.ysw@gmail.com account. In the background of the image is a laptop computer whose screen appears to display a scene from the movie described above for Count Two. Also in the upper right hand corner of the laptop's display is the avatar described above. In the foreground of the image is an erect penis, which one can reasonably conclude is SKINNER's, even though his face is not in the photo. The file naming convention, along with EXIF data[2] related to the image, indicate the picture was taken using SKINNER's Samsung phone. The perspective of the photo, coupled with the file creation date, suggests that SKINNER held the camera close to his chest so that he could photograph himself masturbating while watching the video of V1 masturbating, which is described in Count Two, that he previously recorded on February 5-6, 2018.

28.     Count Four is a movie file entitled "2018-03-05 17-50-35.flv" that SKINNER made on or about March 4-5, 2018. This video, which is 6:43 in length, was taken from a webcam positioned at the foot of V1's bed. During the video, V1 again kneels on her bed in her bedroom, facing away from the camera, bends over, and masturbates with her genitals in plain view. This video has a screen-in-screen display in the upper right hand corner, which displays

---

[2] EXIF is short for "Exchangeable Image File Format," which is metadata relating to the image. When digital cameras take pictures, often the camera will save EXIF data about the photo, including information about the make and model of the camera itself, the date and time the photo was taken, and other information such as aperture size, exposure length, and if the camera is so equipped, geographical location information.

SKINNER's face during the video. At one point during the video the screen-in-screen portion of SKINNER's face starts to bounce, which was evidently caused by SKINNER masturbating during the movie: during V1's audio portion of the video, which was the only one recorded, V1 is heard saying, "What, round two?" This video was recovered from SKINNER's johnvlogchamber@gmail.com pursuant to a federal search warrant.

29. These interactions continued until approximately May 2018 when V1 decided to end her relationship with SKINNER. At first V1 wanted only to end what had become a romantic and online sexual relationship with SKINNER. SKINNER did not take her efforts to break up with him very well, however, and he soon started harassing her and attempting to manipulate her with threats of suicide. V1 repeatedly encouraged SKINNER to seek help for his depression, even sending him a list of psychological specialists in New Zealand he might contact. Ultimately, V1 was forced to block SKINNER online, and she attempted to cut off all of his efforts to communicate with her.

30. During the period when she was attempting to cut off contact with SKINNER, V1 was contacted on Discord by an individual whose username "Tira misu." Because the Tira misu user knew nonpublic facts about V1's relationship with SKINNER, V1 suspected that Tira misu was actually SKINNER using an online alter-ego in an attempt to influence her to maintain contact with SKINNER. V1 ultimately blocked this user on Discord as well. During its investigation, the United States obtained a search warrant, case number 3:18-sw-269, for the Discord account "tira misu#6983." Evidence obtained pursuant to the search warrant revealed that this account was in fact a fictitious online persona created and controlled by SKINNER, commonly referred to as a "sock puppet," which SKINNER employed in an effort to manipulate V1.

31.     On June 20, 2018, SKINNER departed from Auckland, New Zealand, via Qantas Airlines, arriving in Sydney, Australia.  On the same day, SKINNER departed from Sydney, Australia, via American Airlines, arriving in Los Angeles, California.  SKINNER's travel on June 20 continued as he departed from Los Angeles, California, via American Airlines, arriving the next day on June 21, 2018, at Washington Dulles Airport in Dulles, Virginia.  On June 21, 2018, SKINNER took the Greyhound Bus from Washington, DC, to Richmond, Virginia. SKINNER spent the night of June 21, 2018, at the Hostelling International in Richmond, located at 7 North 2nd Street, Richmond, Virginia 23219.

32.     On June 22, 2018, SKINNER used the Lyft ride-sharing application to obtain transportation to the Walmart Supercenter (hereafter "Walmart"), located at 11400 West Broad Street Road, Glen Allen, Virginia, and was dropped off at 12:13pm.  While at Walmart, SKINNER made two purchases.  SKINNER first purchased pepper spray.  In a separate transaction, SKINNER purchased a clip knife and duct tape.

33.     Later on the afternoon of June 22, 2018, at 1:35pm, SKINNER used Lyft again to travel to Bulldog Way, in Goochland, Virginia, arriving at 2:00pm.  Bulldog Way is a road connected to the street on which V1's residence was located.  V1 had previously given SKINNER her actual home address during one of their online chat sessions.  SKINNER attempted to gain entrance to the residence through a basement sliding glass door.  Speaking through the glass door, SKINNER asked V1's mother for help.  V1's mother told SKINNER to go away or she would call the police.  SKINNER responded, "You're not going to help me?" or words to that effect, and the mother repeated her warning.  At that point SKINNER picked up a hard object and began to beat on the glass of the basement sliding glass door.  Unsurprisingly, V1, her sister and her mother were all frightened by SKINNER's actions, so they ran upstairs out

13

of the basement and locked the door at the top of the steps. Family members telephoned V1's father, who in turn called 911. V1's father also instructed the mother to get the family pistol, which was in the house for protection. At one point, V1's mother called out to SKINNER from inside the house and demanded that he leave, told him that the police were on their way, and further told him that she had a gun.

34. The defendant eventually went up the stairs connected to an outside deck that was located over the basement sliding glass door through which he first attempted to force his way into the residence. The entrance to the house from the deck was a wooden door that had a large glass panel. While on the deck, SKINNER took a large gardening stone and smashed the glass panel to this door. He then reached his upper body into the opening created by the smashed glass. As he was doing this, V1's mother shouted at him repeatedly that the police were on the way and that she had a gun and would shoot him. As SKINNER's hand was reaching the interior door knob to unlock the door, V1's mother fired her handgun twice, striking SKINNER once in the neck with a bullet.

35. Law enforcement officers with the Goochland County Sheriff's Office (GCSO) arrived on the scene shortly thereafter and found SKINNER covered in blood and lying in a neighbor's yard. A GCSO deputy sheriff asked SKINNER what happened. SKINNER told the deputy that he was shot while trying to break the window to the door. When the deputy asked further why was trying to break the window, SKINNER said so that he could get to his girlfriend, or words to that effect.

36. In near proximity to SKINNER as he was lying on the ground was a sweatshirt, which investigators later connected to SKINNER. Underneath the sweatshirt was a knife, which was open and in an extended position. Officers also found a backpack nearby SKINNER, which

14

they connected to him.  A search of the backpack revealed a roll of duct tape.  Investigators also recovered from SKINNER a small canister of pepper spray, as well as a hand-written checklist of items to bring, which included pepper spray and duct tape.  As mentioned earlier, GCSO investigators identified and seized two cell phones from him, i.e., a Huawei ALE-L02 P8 Lite and a Samsung GT-I9300 Galaxy S III, which they turned over to the FBI for analysis.

### LOCATION INFORMATION AND THE TARGET ACCOUNTS

37.    While location information might provide additional relevant evidence relating to all of the charged offenses, it is particularly relevant to the kidnapping and attempted kidnapping charges.  Investigators identified footprints on the ground in the vicinity of V1's house that matched the tread on SKINNER's shoes that, based on their locations and direction of travel, indicated that SKINNER did not walk up the driveway to V1's house but rather approached the residence from nearby woods.  Additionally, a comparison of times for SKINNER's Lyft receipt for the trip to Bulldog Way, Goochland, Virginia, showing a drop off time of 2:00 p.m., and the time of the 911 call, at 4:27 p.m., suggests that SKINNER spent several hours in the area before attempting to force his way into the victim's family residence.  Location information obtained from Google relating to the TARGET ACCOUNTS might demonstrate that the defendant was conducting surveillance from nearby woods prior to approaching the house, and might further reveal to investigators specific spots that should be searched for potential additional evidence.

38.    As noted above, a forensic examination of the Samsung and Huawei phones seized from SKINNER revealed that he had used these phones to specifically access the two Gmail accounts, i.e., johnvlogchamber@gmail.com and lottic.ysw@gmail.com, directly linked to the child pornography counts included in the pending indictment.  Both of these phones are Android devices with the Samsung being associated with the lottic.ysw@gmail.com and the

15

Huawei being associated with both Gmail accounts. As noted in Paragraph 14 above, it is likely that Google regularly collected location information relating to these phones and these two Gmail accounts for their business purposes.

39. Forensic evidence obtained from SKINNER's two mobile phones also showed that the 12 additional Gmail addresses included in the list of TARGET ACCOUNTS were associated with a variety of mobile applications on these phones, e.g., PayPal, that also collect location information for their business purposes. Depending on how the location services option was set for each of these applications, i.e., Never, While Using the App, Always, and the defendant's actual use of these applications, one or more of the additional 12 accounts could have relevant location information.

40. Cell phones are arguably the predominant way people communicate in modern society. With the advent of smartphone technology and all of the functions such devices offer, for many people the mobile phone has become as essential to have on their person as any item of clothing. Indeed, as Chief Justice John Roberts observed in *Riley v. California*, 573 U.S. 373 (2014), modern cell phones "are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." With regard to criminal activity, it is well known that criminal coconspirators frequently utilize cellular telephones to communicate with each other via voice calls, text messages, and emails, and the internet, permitting them to plan, coordinate, and execute their crimes. Even incidental cell phone usage that is not directly related to planning a crime may generate location information that would be relevant to investigators investigating the crime.

16

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

41.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Google to disclose to the government copies of the records and other information particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

42.     Based on the foregoing, I request that the Court issue the proposed search warrant. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,

Anthony W. Tuggle
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on this _____ day of August 2019.

/S/
David J. Novak
United States Magistrate Judge

17